ISABELLA ABERNATHY, APPELLANT, VS. MEREDITH B. ABERNATHY, APPELLEE.

1. For the removal of a husband as trustee for his wife by statute, something more is required in consequence of the relation than in the case of an ordinary trustee.

2. In case of desertion by the husband, or of cruelty to the wife, the Court will intercept her estate which may come to his hands or in his possession so as to secure her maintenance and support, and, in such a case, remove him as trustee.

3. They will not remove him as trustee, in case of desertion of the wife, without cause, although the husband may not have been entirely without fault.

4. The conduct of the next friend of the wife in the case reprehended.

5. The Court should take care that its records should be protected as far as possible from obscene expressions.

This case was decided at Marianna.

Isabella Abernathy, by her next friend Malachi Warren, filed her bill of complaint against her husband, Meredith B. Abernathy, and against the sheriff of Jackson county, in which she alleges, that in the year 1852 she intermarried with said Meredith Abernathy, in the State of Alabama, of which State they were both residents; that at the time of her marriage she was possessed of four slaves and about $1,800; that, under the laws of the State of Alabama in force at the time of her marriage, property owned by a woman before marriage is, after marriage, her separate estate, and not liable for her husband's debts, the husband being only the wife's trustee, and liable to be removed from his trust if he becomes incapable or unfit for the discreet management and control of the same; that since her marriage her husband has disposed of and wasted the whole of her separate estate, except one of the negro slaves named Harry, and that, instead of seeking to pro-

tect and preserve the pittance remaining, he is seeking to have it applied in satisfaction of his debts, and thus throw herself and child entirely upon the charity of her friends; that her said husband, pretending to be indebted to one C. C. Cobb, did, on the 21st November, 1855, confess a judgment in his favor, and that the execution which issued thereon has been levied, with the concurrence and consent of her said husband, on her only remaining negro slave. She further alleges, that her husband leads a wild, roving life, without any fixed occupation or abode, and that, in consequence of his neglect of her and of his infidelity and inability to provide for her maintenance, she has been compelled to seek a home amongst her relatives in Alabama. The bill concludes with a prayer for an injunction restraining the sheriff and others from all further proceedings against the said negro slave, and that her husband, the said Meredith B. Abernathy, be ousted of and from his said trust, and that some discreet person be appointed to hold said negro for her as her trustee, and for general relief.

Meredith B. Abernathy, at a subsequent day, filed his answer to said bill, in which he admits the marriage in Alabama, and that she was possessed of the property set forth in the bill, but denies that the law of Alabama, as set forth in the bill of complaint, has any reference to him. Defendant also admits that he has disposed of all the property except the negro slave referred to, but denies that the same has been wasted.

The defendant in his answer proceeds:

" The said property was disposed of under the following circumstances: About the 1st of January, 1853, this defendant, in company with his wife Isabella, with said slaves Harry, Rachel, Nancy and Ellen, started to remove from the State of Alabama to the State of Texas, and at

the close of the first day's travel this defendant was in-
duced by the entreaties and persuasions of his said wife Isa-
bella, to exchange said negro woman Rachel and her two
children Nancy and Ellen, with one Tillman, who resided
in Lowndes county, Alabama, for a negro girl named Ann,
who was represented to be sound, healthy and a valuable
house servant. The said complainant (Isabella) repre-
sented to this defendant that she was utterly ignorant as
to the duties of house-keeping; that said negro woman
Rachel could be of little or no service to her in keeping
house and was very anxious that the exchange should be
made. This defendant further states, that a short time
after their arrival in the State of Texas said negro girl
Ann proved to be seriously diseased, so much so that she
was almost entirely worthless; that as soon as this fact
was ascertained, this defendant started back to Alabama
with said negro girl, and proposed to return her to said
Tillman, on the ground of the false representations as to
her unsoundness, but learned that said negro woman
Rachel and children had been mortgaged by said Tillman
to secure a large debt, and this defendant being unable to
prove the false representations of said Tillman, so as to re-
cover said negroes by legal process, was induced, as a last
resort, to exchange said girl Ann with a negro speculator
for a negro girl named Malinda; that some months after
the return of this defendant the said negro girl Malinda
also became diseased, when she was sold for the sum of
about six hundred dollars. This defendant further states,
that while in Texas he purchased a considerable quantity
of land in Louisiana, which he cultivated one year and
sold for a sum not now recollected, but considerably less
than its actual cost; that he was unsuccessful in farming,
though having used every effort in his power to make a
good crop; that he was induced to sell said land on ac-

count of his said wife Isabella becoming so much dissatisfied with the country; that said sum of $1,800 and the money derived from the sale of Malinda was used in the purchase of said land, in defraying traveling expenses, for goods and necessaries of life for himself and his wife Isabella; also a large amount paid to doctors.

"This defendant, further answering, denies that he is now or has been seeking to have the negro man Harry applied in satisfaction of his debts, but that he and his wife Isabella endeavored to execute a mortgage for the purpose of carrying on the grocery business in the town of Marianna; that his said wife was as much interested in the success of the business as this defendant, as it was for the purpose of making a support as well for his said wife as for himself.

"This defendant, further answering, admits it to be true, as alleged in complainant's bill, that on or about the 21st day of November, 1855, this defendant did confess judgment in favor of Christopher C. Cobb for the sum of seven hundred and six dollars, this being the amount actually due said Cobb by this defendant on a settlement had between them in the month of November, A. D., 1855; that execution issued on said judgment, and that the same was levied on said negro man Harry, but not with the consent or connivance of this defendant, who was aware that the absolute title of said negro man was vested in his wife.

"This defendant, further answering, denies that he leads. a wild, roving life, without any fixed occupation or abode, and says that he is now and expects to be a resident of the county of Jackson, and is now preparing to engage in the practice of medicine.

"This defendant, further answering, denies that he has at… any time neglected his wife, or been unfaithful to her, as stated in said bill of complaint; that such accusation is…

utterly false and groundless; that the charge that this defendant was unable to provide for and maintain his said wife is equally untrue; that, in order to prevent his said wife from being dissatisfied, he boarded her at the best hotel in the town of Marianna (while at the same time this defendant cooked his own food at his grocery, in order to lessen the expense,) and when his wife Isabella became dissatisfied with boarding at the hotel, he procured her board at the house of Mrs. Ming.

"This defendant further says, that, during the year 1854, said negro man Harry was hired to Luke Lott to defray the expenses of board of wife, hire of nurse, &c., and hired to Robert Dickson for the sum of two hundred dollars, and that a large amount was used in discharging the store account of the said Isabella.

"This defendant further says, that from the time of the intermarriage with said Isabella to the time of their separation they lived happily together, and that no efforts were ever spared on his part to add to her prosperity and contentment.

"This defendant, further answering, denies that his said wife Isabella was compelled to seek a home amongst her relations and friends in Alabama. This defendant is prepared to prove that this statement is at variance with the truth.

"This defendant further says, that said Isabella was induced to leave him on the urgent and earnest solicitations of said Malachi Warren and others, on false representations and promises; that said Malachi Warren, as this defendant is informed and believes to be true, stated to said Isabella that, unless she returned to the State of Alabama, he (the said Malachi Warren) would kill this defendant; also, that if she would return with him, he would give her all the wealth her heart could desire."

William Yarborough, a witness examined by defendant, testified that the defendant boarded at his house near eighteen months, commencing in June or July, 1855; that he was engaged in reading medicine whilst with him; that he behaved himself gentlemanly; that he is fully qualified to manage a trust estate if he were disposed, and that if he conducted himself as he did at the house of witness, he is fit and capable to manage a trust estate. Witness further declared, that defendant drank, whilst with him, as men drink who drink at all, and did not drink to excess.

Luke Lott, another witness, testified, that he kept a hotel in Marianna; that when he took possession of the house Mr. and Mrs. Abernathy commenced boarding with him. They afterwards left the house of witness and boarded with Mr. Tillinghast, and subsequently returned to the house of witness, and remained there until they left Marianna. In the year 1855, Malachi Warren, her uncle, sent for Mrs. Abernathy to come immediately to see him at the house of Mr. Tillinghast. Witness went over as soon as he could obtain a leisure moment. A note was handed Mrs. Abernathy, after reading which she asked the two Messrs. Warren, her uncle and brother, "if she could go and see him for the last time." The youngest Warren gave his consent, and Mrs. Abernathy walked out of the room and got out into the passage when Malachi Warren called her. Mrs. Abernathy said she would go and see Mr. Abernathy for the last time. Malachi Warren said she must not leave the house, when Mrs. Abernathy said Mr. Abernathy had never given her a cross word in his life, but Malachi Warren would not allow her to go. Mrs. Abernathy was much affected, shedding tears freely. Malachi Warren took her by the arm and rather forced her into the room. Next day Mrs. Abernathy went off with Malachi and the other Warren. Malachi Warren

borrowed witness' double-barrel shot gun. He said Mrs. Abernathy must not see her husband any more, and that he would take care of her and protect her; that she should not want for anything. Witness hired a negro boy named Harry for about twelve months, amounting to about $116, which was nearly all paid by Mr. Abernathy to witness for the board of his wife, servant and himself, though he boarded his wife with witness for awhile and he boarded himself at his grocery. He was engaged in keeping a bar. Witness thought him a very kind husband, and too kind for his purse. Thinks Mr. Abernathy liked to drink. Thinks him discreet enough to manage a trust estate, if he will let alcoholic drinks alone. He appeared to be very much mortified at the loss of his wife, and cried like a child.

George W. Tillinghast was also examined, who testified that he knows nothing of the habits of Mr. Abernathy; that, so far as witness knows, his conduct towards his wife was kind; that he came in at late hours, but said business at his shop detained him.

Other witnesses were examined, some of whom declared as their opinion that the defendant was not a fit and discreet person to manage a trust estate, whilst others expressed their ignorance upon the subject, and others again that he was competent. The witnesses speak of his habit of drinking, whilst some of them declare that he was intemperate. Several of the witnesses testified to the declarations of the defendant of his presence at improper places, and to his admissions upon a subject which cannot be introduced by the reporter. The witnesses all declare that the defendant passed and was called by the name of Clark.

The Court below enjoined the sale of the negro Harry

under the execution in favor of Cobb, and simply directed the sheriff to hire out said slave for the year 1856.

*J. F. McClellan* for appellant.

*D. P. Holland* and *W. E. Anderson* for appellee.

BALTZELL, C. J., delivered the opinion of the Court.

This is a suit in chancery, instituted by a wife through her next friend against her husband, seeking to have him removed from the office of trustee in the care and management of a negro man, in his possession in virtue of his marital rights.

In the State of Alabama, where these parties resided at the time of their marriage, the law made him trustee and provided, "that if from imbecility, intemperance or other cause, a husband becomes incapable of or unfit for the discreet management and control of the separate estate of his wife, the wife, by her next friend, may file a bill in chancery alleging the unfitness or incapacity of the husband, and if the allegations of the bill are admitted or established by the proof, the chancellor must decree that the husband shall no longer have any control over the estate of his wife or the rents, issues or profits thereof, and the wife shall have the same control thereof as if she were a *feme sole*."—Code of Ala., 381–'2. There were four negroes, a man and wife and his children, and eighteen hundred dollars in money, received by defendant at the time of his marriage.

The allegations of the bill are, that the husband has " disposed of and wasted the whole of said estate except Harry, one of her slaves, and that he is seeking to have him applied to the satisfaction of his debts, and thereby throw his wife and child entirely upon the charity of her

friends; that he leads a wild and roving life, without any fixed occupation or abode, and that, in consequence of his neglect of his wife, his infidelity to her and his inability to provide for her maintainance, she has been compelled to seek a home amongst her relatives in Alabama."

The allegation of waste is denied, whilst it is admitted that the boy Harry is all that remains of the property. It is unnecessary to recite the answer at length. Suffice it to state, that it explains the sale of the other negroes and the expenditure of the money as having been occasioned by the purchase of lands in Louisiana, afterwards sold at a loss, in removing to Texas, first subsequently to Louisiana and thence to Florida, at the earnest solicitation of his wife, in the effort to make a crop, in the purchase of furniture, payment of board and a large amount of physician's bills.

There is no proof of any act of waste. The main reliance in support of the allegation is placed on the fact that the wife's property has not been increased, but diminished.

It may be admitted, that a man of average capacity, commencing with this capital, might, by prudence, industry and economy, have supported himself and family and gradually increased his original stock. There are few, however, succeed to this extent, especially a young couple, in the that season of extravagance, of high hopes and delusive expectations; nor would it be perfectly fair to apply to such the rigorous rules appropriate to a more advanced age. Indeed, a judgment so rigorous might seriously affect the contract of marriage itself; for, if adjudged incompetent to the management of property acquired through that relation, what is to become of its more delicate duties, its graver, more enlarged and higher responsibilities? Nor is success an unerring test of capacity and worth, any more than failure in the management, or loss or deprecia-

tion of property, an infallible indication of unworthiness or incapacity. The most worthy, prudent, careful and economical, industrious and persevering do not always succeed, so that we by no means regard the fact of diminution of property as evidence of unfitness or incapacity, or sufficient cause, on this account, to authorize the removal of such a trustee.

The allegation of defendant's seeking to have Harry applied to the satisfaction of defendant's debts is unsupported by proof. Nor is there proof of the "defendant having lead a wild and roving life, without a fixed occupation or abode," unless it be deduced from the fact of his removal, already alluded to, to three or four different States. Considering the known habits of our people in connection with the fact that these parties were but recently married, this could hardly be regarded as evidence of recklessness or imprudence, but rather of a spirit of enterprize and rightful adventure.

The remaining allegation is, that, "in consequence of his infidelity to her and inability to provide for her maintainance, she has been compelled to seek a home amongst her relatives in Alabama." There is no sufficient evidence of this inability, as it is proved that she was boarded at the best hotels in Marianna, and it does not appear that at any time she was denied or deprived, much less felt the want of the necessaries or comforts of life, whilst her husband, in a commendable spirit of economy, denied himself many of these by preparing his meals at the place where he conducted his business.

The charge of infidelity has a better support—indeed the main stress of complainant's case is laid upon it—to prove which some twelve or fifteen witnesses have been examined. We have read their depositions with extreme repugnance, and, we must add, disgust, and will not refer to

their details. They certainly show a looseness of conversation and wantonness on the part of defendant in ill accordance with the chasteness of one holding the relation of a married man. The impression they produced is that defendant indulged in unworthy vaporing and indecent boasting on a delicate subject, or was careless in his assertions, or not in a condition to perceive their full purport; for surely [no one of ordinary refinement and sensibility could seriously give utterance to such vulgarity. Yet there is no direct proof of criminality, and it can only be inferred from his presence at improper places and the report of his wild and reckless expressions. Yet, with all this, we are not satisfied that this criminality was the real cause of the separation of the wife, or that it " compelled her to seek a home amongst her relatives." It is scarcely to be presumed that the numerous witnesses examined as to this charge could have been in communication with this lady on this subject before the arrival of her uncle and brother, or that they, in the course of the single day of their stay in Marianna, could have been informed of all that these depositions detail, so that this part of the case would seem to have been subsequently procured to justify or excuse her departure rather than give the true cause of it. There is in the record no satisfactory explanation of this act of abandonment and separation, which seems to us to be have been imprudent, precipitate, ill-advised and improper. There is no evidence of conjugal disagreement or altercation, nor the slightest expression of dissatisfaction on her part, nor proof of cruel treatment on his part, nor of such as could fairly be pronounced even ungenerous or unkind. On the contrary, in reply to an injunction of her uncle forbidding an interview before her departure, she makes declarations (adverted to hereafter) decidedly negativing such imputation.

It is not under such circumstances that a court of chancery will interfere against a husband in behalf of a wife. We have no decision· of the courts of Alabama to aid in the determination of this question, yet with the assistance of the English decisions and the rules and principles prevailing in courts of equity, we hope satisfactorily to dispose of the case.

"Courts of chancery, in case of the desertion of the wife by the husband, have ordered the income of her property to be paid to the wife till the husband returns to his duty." Macqueen Hus. and Wife, 99; 2 Atk., 96; 11 Vesey, 12; 2 Vesey, Sr., 561.

"So when a husband, by his cruelty to his wife, forces her to leave him, it will be the same as if he had deserted her.—2 Vern., 93; 2 Vesey, Jr., 198. So the court took cognizance in Williams vs. Collen, not only of the husband's cruelty, but likewise of his dissipation, domestic irregularities and improvident expenditure." "It was a case," says the report, "where the husband proved drunken, rude and abusive to his wife, and, moreover, wasted his substance in riotous living."—Macqueen, 104–'5; 2 Vernon, 752.

"These orders for a maintainance are always made with a view to the probable or possible reconciliation of the parties."—Macqueen, 106.

These cases afford the best analogies to the case before us, and show a higher object and purpose in the courts than the mere preservation of property—the amendment of the husband, the restoration of proper relations between husband and wife. Hence more leniency should probably be extended to a husband trustee than would prevail in the ordinary case of such relation. It is proper to state that there is an effort to establish other facts—intemperance, unfitness, &c.—but, for very obvious reasons, we

cannot regard them in our consideration of the case. They were not put in issue, so that defendant was not called upon to defend himself or disprove them.

We have seen that incontinence or infidelity is the only misconduct established, and the question is, how far this should operate as ground of removal. By the law of Alabama, there must be "imbecility, intemperance or other cause, so that the party becomes incapable of or unfit for the discreet management and control of the property." Now that such action may disturb the conjugal ties and be just ground of complaint for the wife is very clear, yet it is not seen how this is necessarily to affect the management of the property. Certainly no such cause is assigned in the books or treatises. There "the act or omission must be such as to endanger the trust property or to show a want of honesty, a want of proper capacity to execute the duties, or a want of reasonable fidelity."—2 Story Eq., 528. Here there is no unfitness, no incapacity, no want of fidelity nor of honesty, so that, assuming these to exist, the act of impropriety alluded to could scarcely be regarded as sufficient to require the removal.

There are other objections to this proceeding worthy of notice. For the conduct of suits of this character courts of equity have required the intervention of a third party as the next friend of the wife, usually some near relative. In this case, the uncle of the wife has assumed the office, and, we regret to state, with very inadequate appreciation of its character and responsibility. His first appearance in the record is in soliciting a private and exclusive interview with the wife without the assent or knowledge of her husband, and he then, after exciting her apprehension, prevails upon her to leave her husband and go with him to Alabama, taking with her her child, and forcibly preventing a parting interview with her husband, having

armed himself with a gun as a means of menace or defence, or probably intended for use in case of an attempted rescue. Influences so improper and malign—acts and conduct of such injustice and wrong, so palpably violative of all law, both human and divine—an invasion so manifest of the nearest, dearest, most delicate and interesting ties, of the two most important and sacred of all human relations, husband and wife, parent and child, may, in an extreme case of cruelty and oppression, be justifiable, but in the case presented·by the record, admit of no excuse. Even with the utmost rigor of judgment upon the conduct and conversation of the husband, which, so far from being disposed to extenuate we have already characterized in terms of reproof, we perceive nothing to prevent amendment and reformation, but, on the contrary, much to encourage the hope of a returning sense of self-respect on the part of the husband and a due appreciation of domestic ties and obligations, such as serious reflection, with the advance of mature age, may gradually effect. He has engaged in the study of medicine and has gained the testimony of his preceptor to his steadiness and moral worth. The language of his wife, in the moment of separation, too, speaks volumes in his favor. "She started to see him, when her uncle took her by the arm *and forced her into the room.* It was then she said, shedding tears freely, ' *he never gave me a cross word in his lifetime.*' " A witness, being the proprietor of the hotel where she boarded, says : " He was a very kind husband to her, and too kind, I thought, for his purse. He appeared to be very much mortified at the loss of his wife, and cried like a child." The keeper of another hotel where she stayed says, that, " as far as he heard, defendant was kind." Other witnesses depose to the same conduct, and there is but one, of the large number examined, who says that

"his conduct to his wife was in some respects bad."
Where then is there any just ground for saying that such
a man deserves the punishment of the vilest criminal,
nay, a worse fate, for to him even is not denied the solace
of a faithful and affectionate heart. From a prospect and
position so hopeful and encouraging—a duty so solemn,
engaging and imperious, exacted by obligations of the
highest character and having their foundation in the very
innermost recesses of our nature, the wife is enticed to
a position of dependence, poor and miserable at the best;
her peace, quiet of conscience, true happiness bartered for
luxury, nay more, her allegiance to her husband thrown
off and open disobedience avowed—seduced to yield her-
self to the counsels and directions of her husband's ene-
mies—her society, her kindly aid and assistance in his
struggles to advance their common fortunes withheld from
and denied to him and given to them. Instead of trying
to relieve her husband from his faults and follies by her
kindness, gentleness and those graces of the female char-
acter which Providence has given the gentler sex—not for
ornament, but as a means of good—she is prompted to
and withdraws from him this main support, this principal
reliance in his difficulties, so that, if he escapes ruin, it
will be in spite of and independent of her aid and assis-
tance.

Nor is this all. There are other consequences involved
in this rash act. There is a child, to whom the father, as
well as the mother, owes obligation and has corresponding
claims—the duties of nurture, maintenance, counsel and
protection and the claims of paternal upon filial affection.
By this separation, one parent, the head of the family, is
at once debarred and cut off, and who will say that an
adequate substitute is provided? Who shall fulfil, in either

33

case, the appropriate duties of these most sacred relations? For those to whom either wife or child might look for that which these relations impart and bestow, as well as enjoin, may owe to others in the same relation to them what cannot be divided, apportioned or withheld? Could they give it if these did not exist? The very hope is not only illusive but absurd, if not preposterous. The attempt to supplant nature, to supply her offices or to amend her provisions for accomplishing desirable results in the events and mysterious issues of life, is sacriligious as well as unwise. If the uncle and brother would act the part of real friends, as they profess to be, and the lady that of a true wife, let this unfortunate breach be healed, let the sacred bands entered into between her and her husband be preserved, and let his endeavor to reform, already manifested by his engagement in an honorable profession, be encouraged and his affection for his wife reciprocated, and thus there may yet be a brighter future for husband, wife and child.

It is apparent from the views presented that the uncle of this lady is not, in our estimation, her friend, nor entitled to prosecute this suit in her behalf. A party coming into a court of equity, must come with clean hands. Its portals are not open to one who, by his acts at the very threshhold, is a trespasser, with ruthless hand invading the domestic sanctuary. No one who undertakes to excite domestic troubles and destroy domestic peace can hope to assume a position in the Temple of Justice. His conduct in the management of the suit itself is not less objectionable. Questions are propounded by him on behalf of the wife which any woman, possessing the instinctive delicacy of her sex, would blush to hear uttered in her presence— the very recital of which would cover her face with shame and confusion. Nor can we for a moment suppose, from

our estimate of her disposition and character, that this lady could have given them her approval. There is nothing in the record to induce us to believe that she could have desired to instigate such exposure or to spread her husband's disgrace upon the public records, either to gratify resentment, if she had any, or to indulge the prurient curiosity of the vulgar by the perpetuation of a petty scandal. No, we rather believe, for the honor of the sex and her own self-respect, that she would have prevented such a course of enquiry. Can it be believed that the paltry sum at issue, the hire of one negro or his control, could have been on her part the inducement to so perilous an assault? No, we can form no such conclusion; but, on the contrary, are under the impreseion that the disruption of domestic ties has been on the part of the uncle, the true cause of this suit. The property is protected from sale by the injunction granted. Beyond this, for the reasons stated, we decline further interference.

In reference to the conduct of suits of this nature, we deem it proper to add, in conclusion, that although courts may not refuse to consider details, however offensive and disgusting, when such become necessary in the course of investigation, yet they may and should always require the examination of witnesses to be conducted in a spirit of due delicacy, avoiding vulgar and obscene language.

The decree of the court below is affirmed with costs.

DuPONT, J., dissenting.

I am constrained to dissent from the judgment of affirmation pronounced in this cause, nor do I concur in the views of my brethren upon the moral aspect of the case, as presented by the evidence. I can discover, in the vast amount of testimony contained in the record, not one gleam of light which would serve to relieve the darkness of the

moral picture presented to us by the general conduct and deportment of this defendant; and as little do I concur in the reprehension of and the rebuke which has been administered to the individual who appears on the record as the next friend of the complainant. So far from viewing his interference as an outrage upon the conjugal rights of the defendant, I think, considering his relation to this unfortunate female, that he must have been lost to every impulse of manliness had he hesitated to interpose for the purpose of arresting her in the downward course to degradation, to which she was fast tending, through the influence of her connection with a dissipated, debauched husband.

But all these matters I consider as having nothing to do with the question properly presented for our adjudication. It is not the question of divorce or separation that we are called upon to decide, but simply whether or not an individual should be removed from his office of trustee of an estate. In considering that question, it seems to me that but two very simple enquiries are presented: First, has the trustee been prudent and discreet in the exercise of his functions? and, secondly, would the trust property be endangered by a longer continuance under his control? According to the proofs taken in this cause, I think that these questions are of very easy solution. The evidence shows, that, in the brief period of two or three years, the trustee has managed to get rid of every vestige of the trust property, save one negro man, Harry, and that, but for the prompt and friendly interposition of this very next friend, who has been so sternly rebuked for his interference, even that small fragment of the wrecked estate *would have been sold under execution for a debt of the trustee.* But the trustee denies, in his answer, the charge of "waste," and yet that fact and admission contained in that very answer

Abernathy vs. Abernathy.—Dissenting Opinion.

show a most reckless and improvident dealing with the property.

In view of all the facts disclosed by the answer and the proofs, it is impossible for me to resist the conclusion that this trustee should be removed and the property be placed in the custody of one who may be better disposed to protect, if not improve it, for the benefit of this unfortunate lady.